FILED

2007 Jul-23  PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RICKEY LEE SCHEUERMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-05-S-843-NE** |
| | ) | |
| **THE CITY OF HUNTSVILLE,** | ) | |
| **ALABAMA, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rickey Lee Scheuerman, brought suit against the City of Huntsville, Alabama, and Jeffrey Weaber, a bank fraud investigator employed by that city's police department, for serious and permanent internal injuries inflicted during a shooting incident that occurred while Investigator Weaber was off-duty, and, while plaintiff was violating no law.  Plaintiff alleges constitutional claims under 42 U.S.C. § 1983, and supplemental state-law claims of assault and battery, unlawful detention, and negligence under 28 U.S.C. § 1367(a).  The action now is before the court on each defendant's motion for summary judgment (doc. nos. 34, 35).

When summary judgment motions are filed, the pertinent part of Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).[1]

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
>    The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

Defendant Jeffrey Weaber has asserted the affirmative defense of qualified

immunity as an alternative ground for summary judgment.  When assessing such a

defense, the district court must "answer the legal question of whether the defendant

[is] entitled to qualified immunity under [*the plaintiff's*] version of the facts."

*Thornton v. City of Macon*, 132 F.3d 1395, 1397 (11th Cir. 1998) (citing *Cottrell v.*

---

[1]Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986).

*Caldwell*, 85 F.3d 1480, 1486 & n.3 (11th Cir. 1996)).

> Indeed, we approach the facts from the plaintiff's perspective because "[t]he issues . . . concern 'not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of clearly established law.'" *Sheth* [*v. Webster*], 145 F.3d [1231,] 1236 [(11th Cir. 1998)] (quoting *Johnson v. Jones*, 515 U.S. 304, 311, 115 S. Ct. 2151, 2155, 132 L. Ed. 2d 238 (1995)). As this Court has repeatedly stressed, the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). Nevertheless, for summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the plaintiff. *See Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002).

*Lee v. Farraro*, 284 F.3d 1188, 1190 (11th Cir. 2002); *see also Saucier v. Katz*, 533 U.S. 204, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the officers' conduct violated a constitutional right?") (emphasis supplied).

## PART ONE

### *Summary of Relevant Facts*

Rickey Lee Scheuerman was driving south on Bailey Cove Road, en route to his mother's home, around 2:30 p.m. on April 23, 2003, a Wednesday afternoon.[2] At the same time, defendant Jeffrey Weaber also was traveling south on Bailey Cove

---

[2]*See* doc. no. 37 at 2.

Road in a red, Pontiac Grand Prix automobile.[3] That vehicle was "unmarked," in the sense that nothing about its external appearance indicated that it was either owned by, or driven by, an officer of the Huntsville Police Department.  Plaintiff first noticed the red car at the intersection of Bailey Cove Road and Four Mile Post Road (to the west) and Cecil Ashburn ( to the east).[4] He described his initial encounter as follows:

> While I was stopped at that intersection is when I first noticed the red car coming speeding up behind me, [and it] caught my attention because I thought he was going to rear end me.  He broke [sic] so hard that he nose dived where the front end goes down on a car.[5]

As plaintiff continued to drive south on Bailey Cove Road, passing Grissom High School on the left and the South Precinct of the Huntsville Police Department on the right, he noticed the red car tailgating him, so he turned right (west) onto Chatterson Road, a residential street, to allow the automobile to pass him.[6]

After turning off Bailey Cove Road, plaintiff pulled partially into either the first or second driveway on the right side of Chatterson Road at an approximately forty-five-degree angle.[7] After doing so, plaintiff put his transmission into the reverse gear, for the purpose of backing out of the driveway.  Only then did he notice that the

---

[3]*See* doc. no. 37 at 2.

[4]*See id*.

[5]Doc. no. 38, Exh. A (Scheuerman Dep.) at 75-76.  Weaber contends that plaintiff was the one tailgating him.  *See* doc. no. 38, Exh. B (Weaber Dep.) at 156.

[6]*See* doc. no. 37 at 2-3.

[7]*See id*. at 3.

4

red car still was behind him, and driving slowly towards his own automobile.[8]  As a result, plaintiff could not backtrack out of the driveway following the same path he had entered; instead, he had to turn his steering wheel to the left, in order to maneuver his automobile (in reverse) around the red car.[9]  Meanwhile, Weaber exited his vehicle and walked to the rear driver's side panel of plaintiff's automobile.[10]

Plaintiff did not see Weaber exit his vehicle.[11]  As a consequence, when plaintiff began to back out of the driveway, he ran over Weaber's left foot and struck his upper left leg.[12]  Still unaware of either Weaber's proximity to his own automobile, or the fact that he had struck him, plaintiff shifted into drive.[13]

Plaintiff only became aware of the fact that Weaber had exited the red automobile and approached his own vehicle when he saw Weaber's hand, with a gun in it, come through his open driver's side window.[14]  Weaber was wearing a polo-style shirt with the words "City of Huntsville P.D." on his left chest,[15] a badge clipped

---

[8]*See* doc. no. 37 at 3.

[9]*See id* at 3-4.

[10]*See* doc. no. 37 at 4.

[11]*See* doc. no. 44 at 2.

[12]*See* doc. no. 37 at 4.  This resulted in numbness for a couple of hours in Weaber's left pinky toe and an abrasion on the outside of his left knee.  *See* doc. no. 38, Exh. B at 319 (Weaber dep.).

[13]*See* doc. no. 37 at 5; doc. no. 38, Exh. A at 130 (Scheuerman dep.).

[14]*See* doc. no. 37 at 5.  Stated differently, plaintiff had not seen Weaber from the moment Weaber exited his automobile until Weaber's hand came through plaintiff's driver's side window. *See id*. at 4.

[15]*See id*.; *see also* doc. no. 41, Exh. V, Photo D170 (photo of Weaber wearing polo-style

to the right side of his belt, and a gun in a holster on the left side of his body. Plaintiff heard one gunshot and felt pain in the area of his upper left chest.[16] Plaintiff further contends that Weaber then placed the handgun against his stomach and fired twice.[17]

Following the shots, plaintiff stepped hard on the gas pedal of his automobile and sped forward, heading west on Chatterson Road.[18]  (Plaintiff claims he heard a fourth shot fired, as he was leaving the scene, as evidenced by a powder burn on his lower lip and small scar on the left corner of his mouth.[19]  Only three shell casings were found at the scene, however, and only three rounds were missing from Weaber's gun.[20])

The shooting incident lasted between three and five seconds, during which time plaintiff never looked at or spoke to Weaber.[21]  Plaintiff's automobile was not moving, but completely stopped, when he was shot by Weaber.[22]

---

shirt).  The court notes it is very difficult to read the Huntsville PD logo on this otherwise non-descript shirt.

[16]*See* doc. no. 37 at 5.

[17]*See id.*

[18]*See* doc. no. 37 at 5-6.

[19]*See* doc. no. 38, Exh. B at 142-43.

[20]*See* doc. no. 37 at 6.

[21]*See* doc. no. 44 at 8.

[22]*See* doc. no. 44 at 13.  Defendant Weaber accepts plaintiff's version of the facts for summary judgment purposes only.  *See* doc. no. 37 at 2 n.1.  Weaber's version of the events, however, differ in that Weaber claims plaintiff reversed his vehicle toward him, whereupon Weaber

Prior to exiting his automobile to confront plaintiff, Weaber did not make a radio call or use his police blue light.[23]  Weaber failed to put his radio on his person before exiting his vehicle, allegedly because it had fallen from the passenger seat onto the passenger side floor board when he stopped on Chatterson.[24]

After being shot, plaintiff sped off, going west on Chatterson Road, and pulled into the driveway of an alleged family friend's home at 904 Chatterson Road.[25]  As plaintiff sped off, Weaber ran back to his automobile and radioed "10-34" to the dispatcher, a code that indicated he had been involved in a shooting incident.[26]  The dispatcher requested Weaber's location.[27]  Because Weaber did not know his location, he drove in reverse toward the Bailey Cove Road intersection until he was able to see a street sign.[28]  Weaber then radioed to the dispatcher, "I'm off of Chatterson off of Bailey Cove."[29]  Radio traffic then occurred as follows:

*Investigator Weaber*:  Subject attempted to run me over.  He's pulled

---

grabbed onto the driver's side window with his right arm, yelled that he was a cop, and commanded plaintiff to stop.  According to Weaber, he fired his gun three times with his left hand at plaintiff's center mass while plaintiff's vehicle was moving in reverse.  When plaintiff's vehicle stopped, Weaber jumped off, and the vehicle sped away.  *See* doc. no. 38, Exh. B at 178-84.

[23]*See* doc. no. 44 at 7.

[24]*See id*. at 8.

[25]*See* doc. no. 37 at 6.

[26]*See id*.

[27]*See id*.

[28]*See id*. at 6-7.

[29]*See id*. at 7.

away from me and I don't know where he's gone to.  He has been 10-34 [*i.e.*, shot].

*Dispatcher*:  Lincoln 9, 10-4.  Do you have a vehicle description?

*Investigator Weaber*:  It was a maroon Mercury Sable.  I have been involved in a pedestrian 10-50 [*i.e.*, hit by vehicle].  He has run over my left leg and foot.  I have no idea where he's gone to.[30]

Weaber then drove quickly forward (*i.e.*, west) on Chatterson Road, unknowingly passing plaintiff who was parked in the driveway of 904 Chatterson, on the left side of the road.[31]  Weaber continued west on Chatterson Road until he came to Farley Drive, where he looked left and right for plaintiff; but, not seeing him, Weaber turned left onto Farley Road.[32]  Weaber then turned left onto Cornelia Drive, took another left onto Bailey Cove Road, and then began traveling north on Bailey Cove Road.[33]

Officer Ronnie Shumate  was sitting in his personal automobile in a turn lane on Bailey Cove Road and heard about the shooting over his radio.[34]  Officer Shumate saw Weaber and followed him on Chatterson Road.[35]  Weaber drove slowly down

---

[30]Doc. no. 37 at 7.  Plaintiff disputes Weaber's asserted justification for the shooting as fear of being pulled under the car or being run over by the car.  As discussed in Part Two, § A(2)(b)(3) *infra*, plaintiff submits the expert opinion of William T. Gaut, who concludes that the physical evidence of bullet trajectories is inconsistent with Weaber's version of events.  *See* doc. no. 44 at 16-19; doc. no. 50, Exh.30 (Gaut Dep.).

[31]*See* doc. no. 37 at 7.

[32]*See id.*

[33]*See id.* at 7-8.

[34]*See id.* at 8.

[35]*See id.  See also* doc. no. 44 at 4-5.

Chatterson Road and ultimately found plaintiff in the driveway of 904 Chatterson Road.[36]   Weaber radioed the dispatcher, "Okay, I've located him now."[37]   When Weaber approached, plaintiff pleaded with him not to shoot him any more, to which Weaber replied:  "Shut up, I'm a cop."[38]

Shortly thereafter, Officer Tim Evans arrived and arrested plaintiff.[39]   Officer Evans first placed one set of handcuffs on plaintiff.[40]   After plaintiff complained he could not breathe, Evans placed an additional set of handcuffs, latched together on him and waited for the ambulance to arrive.[41]   Officer Shumate observed Weaber limp and then fall to the ground.[42]   Weaber informed Investigator Frank Fitzgerald, the first homicide investigator to arrive on the scene, that his leg had been run over and that his foot was numb.[43]   Plaintiff and Weaber were transported to the hospital in separate ambulances.[44]

Weaber sustained abrasions on his right forearm, the outer part of his left knee,

---

[36]See doc. no. 37 at 8.

[37]Id.

[38]Doc. no. 44 at 5.

[39]See doc. no. 37 at 9.

[40]See doc. no. 44 at 5.

[41]See doc. no. 37 at 9, doc. no. 44 at 5.

[42]See doc. no. 37 at 9.

[43]See id.

[44]See id. at 9-10.

and his neck, and he had numbness in his left pinky toe.[45]  Plaintiff was hospitalized from April 23 through June 30, 2003 (69 days).[46]  Upon admission, plaintiff underwent immediate surgery and was put into a chemically-induced paralysis and managed on a ventilator.[47]  His subsequent surgeries included exploratory laparotomy, multiple stomach repairs, transverse colon resection with right colostomy, left diaphragm repair, removal of the spleen, gallbladder, and appendix, and chest tube placement.[48]  Plaintiff's post-operative course was complicated by acute respiratory distress syndrome with persistent air leaks requiring chest tube drainage.[49]  He also was treated for sepsis, deep venous thrombosis of his right arm, and pneumonia.  Plaintiff had a prolonged stay in the intensive care unit and was finally taken off a ventilator.[50]  His medical bills exceeded $554,315.[51]  An administrative law judge for the Social Security Administration later concluded that plaintiff was disabled as a result of internal injuries sustained in the shooting, and entitled to disability insurance benefits.[52]

---

[45]*See id.* at 10.

[46]*See* doc. no. 44 at 5-6.

[47]*See* doc. no. 46, Exh. 11 at 3.

[48]*See id.*

[49]*See id.*

[50]*See id.*

[51]*See* doc. no. 44 at 11.

[52]*See* doc. no. 55 at 4.

Upon plaintiff's discharge from the hospital, he was transported to jail.[53]  He was indicted by a Madison County Grand Jury on August 29,2003, for the attempted murder of Investigator Weaber.[54]  That charge ultimately was dismissed, however, upon a motion to *nolle prosequi* filed by the Assistant District Attorney to whom the case had been assigned for prosecution.[55]

On the date of the events leading to this suit, Weaber was working out of the *West* Precinct as an investigator, working mainly bank fraud cases.[56]  The incident between plaintiff and Weaber occurred in the *South* Precinct.[57]

Plaintiff's driving record was ordered on April 29, 2003, and revealed no accidents or citations.[58]

In contrast, prior to his employment by the City of Huntsville as a police officer in 1988, Weaber had been involved in two traffic accidents, and had been issued citations for running at least one stop sign and five speeding tickets.[59]  Furthermore, during the course of his employment with the City of Huntsville, Weaber had between

---

[53]*See* doc. no. 37 at 10, doc. no. 44 at 6.

[54]*See* doc. no. 37 at 10.

[55]*See* doc. no. 44 at 11.

[56]*See* doc. no. 44 at 6.

[57]*See id.*

[58]*See id.* at 11.

[59]*See* doc. no. 44 at 6.

11

thirteen and fourteen automobile accidents in his patrol car.[60]  Weaber also has been

stopped for moving traffic violations on three or four occasions while driving his

personal vehicle, but had not been cited.[61]  (The court is told that, as a matter of

"courtesy" and informal practice, Huntsville police officers do not issue tickets

against other law enforcement officers.[62])  Finally, and despite the fact that the

Huntsville Police Department had a policy and written directive discouraging officers

from making traffic stops when driving unmarked vehicles, except in emergency

situations,[63] Weaber had made two traffic stops in his unmarked patrol car prior to

April 23, 2003.[64]

Weaber also has been charged with lying to his supervisors on at least two

occasions.[65]  Weaber was notified on October 4, 1990 that he was being suspended

without pay for ten days for being involved in a one-car accident that damaged a rim

and tire.[66]  Weaber changed the rim and tire, altered his Daily Worksheet, changed the

pre-shift vehicle inspection report to state "rim in trunk bent and damaged," and

---

[60]*See id.* at 7.

[61]*See* doc. no. 44 at 8.

[62]*See id.*; *see also* doc. no. 40, Tab K (West Dep.) at 28-29.

[63]*See* doc. no. 44 at 7; *see also* doc. no. 40, Tab K (West Dep.) at 29-30.

[64]*See* doc. no. 44 at 7.

[65]*See* doc. no. 44 at 14.  Defendants did not respond to plaintiff's additional statement of facts regarding Weaber's conduct when filing their reply.  *See* doc. no. 55.  These additional facts are, therefore, deemed admitted.  *See* doc. no. 14, Appendix II at 18 (Initial Order).

[66]*See* doc. no. 44 at 14.

12

failed to notify his supervisor of his accident.[67]  Weaber was suspended for one day on July 7, 1991, for incurring his fourth at-fault accident within a three-year period.[68] Weaber received an official reprimand on October 30, 1992, for incurring his fifth at-fault accident within a three-year period.[69]

Weaber's supervisor stated in 1994 that "[i]t is unfortunate[] that Officer Weaber, by his actions, no longer proves to be an asset to the City of Huntsville and the citizens it serves.  I recommend that Officer J. Weaber's position as a police officer with the Huntsville Police Department be terminated in an effort to continue an acceptable level of service to the community."[70]  Weaber was not terminated, however, but instead demoted to Detention Officer for a short period of time and given a ten-day suspension without pay.[71]

Another citizen, Marc Yanchak, filed an internal affairs complaint against Weaber on April 15, 1998, for stopping him in an unmarked car.[72]  Weaber refused to provide Yanchak proof that he was a police officer and wrote him a ticket for reckless driving.[73]  Yanchak remembers Weaber reaching inside his vehicle, turning

---

[67]*Id*.

[68]*See* doc. no. 44 at 14.

[69]*See id*.

[70]Doc. no. 44 at 14-15.

[71]*See id*. at 15.

[72]*See id*.

[73]*See id*.

13

off his ignition, grabbing his arm and ordering him not to leave.[74]  Despite attempting to find out the result of his complaint, Yanchak was never provided any information about the outcome.[75]

Weaber was given another official reprimand on December 12, 2000, for two at-fault accidents within a six-year period, both occurring in 2000.[76]  Weaber ran a red light and struck another vehicle on January 7, 2000.[77]  When asked why he ran the red light, Weaber responded, "I had my head up my ass."[78]  Weaber was not issued a ticket for running the red light.[79]

Weaber received annual employee evaluations from the City of Huntsville since he began his employment, but he was not evaluated during the 2002-2003 time frame which would cover the allegations contained in plaintiff's complaint.[80]  The annual evaluations for 2001-2002 and 2003-2004 are identical.[81]  Weaber's 1997-1998 annual evaluation reflects no instruction regarding his use of an unmarked vehicle to make a traffic stop on Marc Yanchak.[82]  His evaluation for the year 2000-

---

[74]*See id.*

[75]*See* doc. no. 44 at 15.

[76]*See id.*

[77]*See id.*

[78]Doc. no. 44 at 15; doc. no. 38, Exh. B. at 118 (Weaber Dep.).

[79]*See* doc. no. 38, Exh. B at 118.

[80]*See* doc. no. 44 at 16.

[81]*See id.*

[82]*See id.*

2001 does not reflect the written reprimand Weaber received for two at-fault traffic

accidents within that year.[83]

PART TWO

*Discussion of Plaintiff's Claims Against Jeffrey Weaber*

## A. Federal Claims

Plaintiff asserts two Fourth Amendment claims against defendant Weaber: one

for excessive force due to the gunshot wounds, and one for unlawful detention (false

imprisonment).  Weaber argues that he did not violate any constitutional rights and

that he is entitled to qualified immunity.

The doctrine of qualified immunity protects governmental officials who are

sued under 42 U.S.C. § 1983 for money damages in their personal, or individual,

capacities, but only so long as "their conduct violates no clearly established statutory

or constitutional rights of which a reasonable person would have known."  *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> The purpose of this immunity is to allow government officials to carry
> out their discretionary duties without the fear of personal liability or
> harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107
> S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but
> the plainly incompetent or one who is knowingly violating the federal
> law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001).
> Because qualified immunity is a defense not only from liability, but also
> from suit, it is "important for a court to ascertain the validity of a

---

[83]*See id.*

qualified immunity defense as early in the lawsuit as possible." *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

      In order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)). If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity . . . .

*Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002); *see also*, *e.g.*, *Chesser v. Sparks*, 248 F.3d 1117, 1121-22 (11th Cir. 2001). When a defendant establishes that he was acting within his discretionary authority in performing a contested act, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194; *see also*, *e.g.*, *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.") (citing *Suissa v. Fulton County*, 74 F.3d 266, 269 (11th Cir. 1996); *Barnette v. Folmar*, 64 F.3d 598, 600 (11th Cir. 1995)).

Essentially, the doctrine provides that "[g]overnment officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hartley v. Parnell*, 193 F.3d 1263, 1268

16

(11th Cir. 1999) (quoting *Harlow*, 457 U.S. at 818).[84]  In analyzing a qualified

immunity defense, district courts are to consider only the "clearly established law and

the information possessed by the official at the time the conduct occurred." *Swint v.*

*City of Wadley, Ala.*, 51 F.3d 988, 995 (11th Cir. 1995).

> What this means in practice is that "whether an official protected by
> qualified immunity may be held personally liable for an allegedly
> unlawful official action generally turns on the 'objective legal
> reasonableness' of the action, assessed in light of the legal rules that
> were 'clearly established' at the time [the action] was taken."

*Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Anderson*, 483 U.S. at 639 (in

turn quoting *Harlow*, 457 U.S. at 819).

> When the defense of qualified immunity is available to a
> particular defendant in a section 1983 context, a plaintiff must establish
> a lack of objective good faith to avoid a directed verdict in favor of the
> defendant.  *See Barnett v. Housing Auth.*, 707 F.2d 1571, 1582 (11th
> Cir.1983); *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727,
> 2738, 73 L. Ed. 2d 396 (1982) (summary judgment); *Schopler v. Bliss*,
> 903 F.2d 1373, 1380 (11th Cir.1990) (motion to dismiss).

*Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (emphasis added).

Qualified immunity "gives ample room for mistaken judgments by protecting all but

the plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant*,

502 U.S. 224, 229 (1991) (internal quotations and citations omitted); *see also, e.g.*,

---

[84] *See also, e.g.*, *Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000) ("Qualified
immunity shields a § 1983 defendant from liability for harms arising from discretionary acts, as long
as the discretionary acts do not violate clearly established federal statutory or constitutional rights
of which a reasonable person would have known.").

*Busby v. City of Orlando*, 931 F.2d at 773 ("This standard shields all government officials except those who either are plainly incompetent or who knowingly violate the law.") (citations omitted).

Under *Saucier v. Katz*, 533 U.S. 194 (2001), the court conducts a two-part inquiry. First, the court asks whether the facts, taken in the light most favorable to plaintiff, show that Weaber's conduct violated a constitutional right. *Id*. at 201. If the court finds such a violation, the court asks whether the right was "clearly established"— that is, whether it would have been clear to a reasonable officer that Weaber's conduct was unlawful. *Id.* at 202.

### 1.   <u>Unlawful Detention</u>

With regard to the unlawful detention claim, defendant Weaber moved for summary judgment arguing that he did not personally or actively procure plaintiff's arrest.[85] Thus, defendant correctly points out that he cannot be liable for an arrest that he did not make. Plaintiff cites no authority for his argument that actions leading to his arrest subject Weaber to liability for false arrest. Thus, the false arrest claims against Weaber are due to be dismissed.

However, plaintiff explains in his response that he did not assert only a false

---

[85]*See* doc. no. 37 at 20-21.

arrest claim under the Fourth Amendment against defendant Weaber.[86]  His unlawful

detention claim is also one for false imprisonment, challenging the detention at the

outset that led to the shooting.[87]  The motion for summary judgment does not address

this claim, so it will be considered at trial. Defendant's motion for summary judgment

is due to be granted in part regarding the false arrest claim only.

### 2.   **Excessive Force**

#### a.   **Fourth Amendment Seizure**

Plaintiff's excessive force claim is well-recognized under the Fourth

Amendment.  The Fourth Amendment provides that "[t]he right of the people to be

secure in *their persons*, houses, papers, and effects, against *unreasonable* searches

and *seizures*, shall not be violated . . . ."  U.S. Const. amend. IV (emphasis supplied).

As the emphasized words clearly indicate, the Fourth Amendment protects "persons,"

not places and things.  *Katz v. United States*, 389 U.S. 347, 351 (1967) (holding that

"the Fourth Amendment protects people, not places"); *see also United States v.*

---

[86]*See* doc. no. 44 at 22-24.  Count Four of the complaint alleges unlawful detention under § 1983.  The facts alleged support claims for both unlawful detention (false imprisonment) and unlawful detention (false arrest).

[87]While the competing versions of the facts may create a dispute as to whether plaintiff was "seized" at the point the vehicles were stopped, it is clear that once plaintiff was shot three to five seconds later, he was seized for purposes of the Fourth Amendment.  *See Tennessee v. Garner*, 490 US. 386 (1989).  Because defendant only moved for summary judgment with respect to an unlawful arrest claim, and did not address the unlawful detention (false imprisonment) claim, the court need not speculate regarding that evidence or argument surrounding the unlawful detention (false imprisonment) claim.

*Puglisi*, 723 F.2d 779, 786 (11th Cir. 1984) (observing that the Fourth Amendment "applies to places and things only when people have reasonable privacy or possessory interests in them").

Furthermore, "[t]his inestimable right of personal security belongs as much to *the citizen on the streets of our cities* as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968) (emphasis supplied); *see also Delaware v. Prouse*, 440 U.S. 648, 663 (1979) ("As *Terry* . . . recognized, people are not shorn of all Fourth Amendment protection when they step from their homes on the public sidewalks. *Nor are they shorn of those interests when they step from the sidewalks into their automobiles*.") (emphasis supplied).

Routine traffic stops may result in a Fourth Amendment "seizure" of drivers and passengers alike. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision.") (citations omitted); *Prouse*, 440 U.S. at 653 ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention quite brief.") (citations omitted). "It must be recognized that whenever a police officer accosts an

individual and restrains his freedom to walk [or *drive*] away, he has 'seized' that person." *Terry*, 393 U.S. at 16;[88] *see also*, *e.g.*, *United States v. Hensley*, 469 U.S. 221, 226 (1985) ("[S]topping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment."); *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) ("A routine traffic stop is a seizure within the meaning of the Fourth Amendment.").

 The right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). Once an individual is apprehended or detained by the use of deadly force, there is a "seizure" for Fourth Amendment purposes. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

### b. **Qualified Immunity**

#### (1) *Does qualified immunity even apply?*

While neither party analyzes this issue with any precision, it should be noted at the outset of discussion that defendant Weaber has failed to articulate how qualified immunity would even apply under these circumstances. A traffic stop "is valid under the Fourth Amendment if the stop is based on an observed traffic

---

[88] *But see Terry*, 392 U.S. at 19 n.16 ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (*en banc*).  Interestingly, defendant Weaber insists that he was <u>not</u> making a traffic stop.[89]  This may be due in part to a fact noted in the previous Part of this opinion: *i.e.*, that the Huntsville Police Department had a policy and written directive discouraging officers from making traffic stops while driving unmarked vehicles, except in emergency situations.[90]  Weaber's insistence that this was not a traffic stop may also arise from the fact that he failed to turn on his blue lights or call in on his radio.[91]  When Weaber was asked why he — an off-duty bank fraud investigator in an unmarked police vehicle — exited his automobile and approached plaintiff, Weaber responded:  "The simple fact that he followed me down Bailey Cove Road for two to three miles tailgating."[92]  But it is clear from the record that Weaber did not approach plaintiff's vehicle for the purpose of issuing a traffic citation, and that he made no attempt to identify himself as a police officer upon exiting his vehicle.[93]

---

[89]*See* doc. no. 55 at 2; *see also* doc. no. 38, Exh. B at 171-172 (Weaber Dep.).

[90]*See* doc. no. 44 at 7; *see also* doc. no. 40, Tab K (West Dep.) at 29-30.

[91]*See* doc. no. 44 at 7.  Prior to April 23, 2003, Weaber had made two traffic stops in his unmarked patrol car.  *See id*.

[92]Doc. no. 38, Exh. B at 176 (Weaber Dep.).  Which party was tailgating remains disputed in the record.  Plaintiff claims Weaber was the one tailgating.

[93]*See* doc. no. 38, Exh. B (Weaber Dep.).
Q.  When you exited the patrol car, did you put your light up on the dash?

While qualified immunity protects officials performing discretionary duties, it is not at all clear to the court that qualified immunity protects an off-duty bank fraud investigator who becomes angry after allegedly being tailgated, and who admittedly is not engaging in a traffic stop.

If Weaber was not performing a traffic stop, then what was he doing?  And how can he be performing a discretionary duty that qualified immunity was designed to protect?

In some ways, Weaber's act of exiting his vehicle can be analogized to an off-duty officer who walks into a bar and becomes angry when someone bumps into him. If the officer confronts the person with his gun drawn, can he be said to be acting

---

A. No.

Q. Did you –you have a siren in that car?

A. Yes.

Q. Did you toot your siren in any way?

A. No.

Q. Well, what did you do when you got out of your patrol car?

A. I got out of my car and walked around to this side of the vehicle.

. . . .

Q. Now, as you get out of your car, do you announce who you are?

A. No.

Q. So you just exit your car, you walk directly behind Mr. Scheuerman's car and approach him from the left rear quarter-panel; is that correct?

A. Yes.

Q. And in fact, you never announced who you were, did you?

A. Not at this point, no.

Q. In fact you never announced who you were before he began to back up, did you?

A. No.

*Id*. at 163-65.

23

within his discretionary authority?  Or is he, instead, abusing his authority?  Does the mere fact that he is a police officer when he engages in the confrontation entitle him to qualified immunity?  Of course not.

Defendant has cited no case law to indicate how he would be qualifiedly immune from suit under such circumstances.  To be sure, off-duty police officers performing discretionary duties can be entitled to qualified immunity.  But it is not clear from the record before this court that defendant was acting pursuant to his discretionary authority for purposes of qualified immunity in this instance.  The defendant must first establish that he was acting within his discretionary authority in performing a contested act before "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Lee*, 284 F.3d at 1194.  Defendant has failed to do so.

However, even assuming the defense applies under these circumstances, the defense nonetheless fails, as will be explained in the following sections.

> (2)     ***Did Weaber's use of deadly force violate the Fourth Amendment?***

The pivotal question for purposes of Fourth Amendment analysis is whether the seizure was "unreasonable."  *See*, *e.g.*, *Whren*, 517 U.S. at 810 ("An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under

24

the circumstances."); *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure'

alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"); *United*

*States v. Sharpe*, 470 U.S. 675, 682 (1985) ("The Fourth Amendment is not, of

course, a guarantee against *all* searches and seizures, but only against *unreasonable*

searches and seizures.") (emphasis in original); *Elkins v. United States*, 364 U.S. 206,

222 (1960) (same).

The reasonableness inquiry is shaped by "all the circumstances of this on-the-

street encounter." *Terry*, 392 U.S. at 9.[94]   In determining whether the seizure was

"unreasonable," the court's "inquiry is a dual one — whether the officer's action was

justified at its inception, and whether it was reasonably related in scope to the

circumstances which justified the interference in the first place." *Id*. at 19-20; *see*

*also United States v. Jones*, 44 F.3d 860, 871 (10th Cir. 1995) ("Under *Terry*, the

---

[94] This quotation is taken from the following passage in Chief Justice Warren's opinion for the Court in *Terry*:

> Of course, the specific content and incidents of [a person's right to be free from unreasonable governmental intrusion] must be shaped by the context in which it is asserted.  For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.  Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland.  The question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure.

*Terry v. Ohio*, 392 U.S. 1, 9 (1968) (citations and internal quotation marks omitted); *see also id*. at 17 n. 15 ("In our view the sounder course is to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, *and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness*.") (emphasis supplied) (citations omitted).

actions of the police must be justified at their inception and reasonably related to the circumstances which originally justified their interference.").

### (a)   *Inception of stop*

Plaintiff challenges the inception of the stop as unreasonable under the Fourth Amendment because it led to his being shot and ultimately detained.[95]  To the extent that plaintiff challenges the inception of the stop because it led to the use of excessive force, the reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment he made the decision to employ deadly force.  *See e.g., Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996); *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1995); *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992); *Fraire v. City of Arlington*, 957 F.2d 1268, 1275-76 (5th Cir. 1992); *Greenridge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991).  The circumstances that required plaintiff to stop his vehicle are not relevant to the inquiry regarding Weaber's ultimate decision to use force.  *See Fraire*, 957 F.2d at 1276 ("The constitutional right to be free from unreasonable seizure has never been equated by the Court with the right to be free from a negligently executed stop or arrest.")  To the extent plaintiff challenges the inception of the stop as part of his unlawful detention claim (and as discussed earlier),

---

[95]*See* doc. no. 1 (complaint) at 5-6.

no summary judgment motion was filed with respect to this claim, and further consideration of the evidence and legal analysis are required before the court can determine whether plaintiff was unlawfully detained under a false imprisonment theory.[96]

### (b)    *Scope of intrusion on the liberty of plaintiff*

Even if a seizure is justified at its inception, it still may violate the Fourth Amendment "*by virtue of its intolerable intensity and scope*"; indeed, the scope of the seizure "must be *strictly tied to and justified by the circumstances which rendered its initiation permissible*." *Terry*, 392 U.S. at 17-18 (emphasis supplied) (citations and internal quotation marks omitted).

The question of whether a particular seizure was reasonably related in scope to the circumstances that justified curtailment of an individual's freedom must be judged by an objective standard:  "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21-22 (citations, footnotes, and internal quotation marks omitted); *see also Wren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Prouse*, 440

---

[96]The court questions whether a seizure can be said to have occurred prior to the use of force to support an unlawful detention (false imprisonment) claim, but leaves that issue for trial in the form of a Rule 50 motion.

U.S. at 654 ("[T]he reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against an 'objective standard,' whether this be probable cause or a less stringent test.") (footnotes omitted).[97]

Weaber argues that he is entitled to qualified immunity on the excessive force claim because a police officer is allowed to use deadly force "when he is confronted with a car backing toward him in reverse as he is approaching the driver, where that car actually makes contact with his leg, arms, and foot, where he fears the car is going to pull him under and kill him, and where the entire incident evolves rapidly[,] lasting only a matter of seconds."[98]   The Supreme Court has instructed that courts are to evaluate excessive force claims considering the "totality of the circumstances." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989).  The court looks not only to the moment shots were fired, but also examines the circumstances immediately prior to Weaber's decision to use deadly force.  The court must ask what precipitated the need to shoot plaintiff.

This is <u>not</u> a case where a uniformed officer uses potentially deadly force by crashing into the driver to prevent harm to others, after activating his blue lights and

---

[97] *Accord Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (*per curiam*).

[98] Doc. no. 55 at 20.

siren, and chasing a car whose driver is fleeing and driving recklessly in the dead of night. *See Scott v. Harris*, 127 S. Ct. 1769 (2007).

This is <u>not</u> a case where a uniformed officer, attempting to apprehend a drug trafficker, identifies himself and uses deadly force in self-defense of a moving car. *See Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005).

This is <u>not</u> a case where a uniformed officer uses deadly force on a suspected felon after he avoids an investigatory pat-down, flees in a car, and engages in a high-speed reckless chase with multiple police cars in tow, and refuses to get out of his car once it had been blocked on three sides and told by police to exit his vehicle. *See Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002).

Instead, this is a case in which an off-duty investigator, who was not in uniform, exited his unmarked vehicle to confront an individual, and drew his weapon when there was no reasonable suspicion that a crime had even been committed. It is undisputed that plaintiff did not see Weaber exit his vehicle, and was not aware that Weaber was walking toward plaintiff's automobile, until Weaber's arm, with his hand holding a gun, appeared through his front window. Viewing the totality of the circumstances, it was not objectively reasonable for Weaber to use deadly force on the plaintiff.

The case of *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992), is

instructive.  In *Fraire*, an officer for the Arlington police department was driving an unmarked police car and dressed in plain clothes when he saw a pickup truck make an extremely wide right turn and nearly collide with oncoming traffic.  *See id*. at 1270.  The officer noticed both male occupants of the pickup had an open can of beer in their hands.  957 F.2d at 1270.  The officer then observed the driver, Fraire, swerving into other lanes.  The officer called his dispatcher, provided a description of the truck and its license number, and requested that a marked patrol car stop the truck.  The officer then observed the pickup truck pull into a driveway.  The officer stopped across the street and advised his dispatcher of the location of the pickup truck and that he intended to speak with the occupants of the truck.  The officer removed his badge from his belt, placed it face open in his hand, and showed it to the occupants of the truck.  *See id*.

Fraire then sped down the side street into a residential neighborhood.  The officer returned to his car, radioed the dispatcher, and followed slowly.  The officer observed Fraire driving erratically, nearly ramming the officer's car.  Fraire ultimately rammed the curb, causing the truck's engine to die.  *See id*. at 1271.  The officer parked his car 25 to 30 feet away from Fraire.  After advising the dispatcher of his new location, the officer left his car on foot and walked around to the passenger side and identified himself as a police officer, which was verified by a number of

30

eyewitnesses.  Fraire re-started the truck and began to drive away.  One eyewitness observed the truck driving fast, squealing its tires, and heading toward the officer. *See id*.  The eyewitness saw the officer holding a hand-gun with both hands in front of him, shouting "hault" (sic).  *Id*.  Other witnesses verified the truck was going fast and would have run over the officer.  957 F.2d at 1272.  The eyewitnesses also observed the officer waiting until the last possible moment before he pulled the trigger.  Fraire died of a gun shot wound to the head.  *See id*.

The court concluded that the officer was entitled to qualified immunity under these circumstances.  The officer had probable cause to stop Fraire because he was observed to be drinking and driving.  The officer reasonably believed that Fraire might cause death or serious bodily injury to himself or others based on the fact that Fraire drove recklessly at a high speed when attempting to flee, and that he appeared to attempt to run down the officer.  957 F.2d at 1277.  The eyewitness accounts confirmed that the officer was in mortal danger of being run over.  *See id*.

The facts in *Fraire* stand in stark contrast to the facts of the instant case.  Even accepting Weaber's testimony that he thought his life was in danger, and that he had to shoot to keep plaintiff's vehicle from pulling him under the tire, an officer's good intentions cannot make an objectively unreasonable use of force constitutional.  *See Graham*, 490 U.S. at 397.  The use of force must be viewed using objective standards

31

under the totality of the circumstances.  *See Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) (noting that if the officer stepped in front of plaintiff's rapidly moving vehicle leaving plaintiff no time to brake, then the officer would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect himself).

The parties agree that the encounter at issue lasted only three to five seconds. Under these peculiar circumstances, the court finds it was objectively unreasonable for Weaber to approach  plaintiff's vehicle unannounced, grab onto plaintiff's car as it was being placed in reverse, and then start shooting plaintiff's midsection to make plaintiff stop.

### (3)    *Fact Dispute Regarding Qualified Immunity*

Summary judgment on the grounds of qualified immunity also is unavailable to Weaber because plaintiff raises a serious challenge to Weaber's version of events. Plaintiff's evidence, offered in opposition to summary judgment by his expert, William T. Gaut, includes the following assessment of the forensic facts:

> In the examination of Investigator Weaber's statement regarding the circumstances occurring at 916 Chatterson Road, I found several conflicts.  Sergeant Warmbrod was not correct when he reported that Mr. Scheuerman "began backing the Mercury Sable directly at Investigator Weaber."  According to Investigator Weaber's statement, he was walking toward the Scheuerman vehicle and "as I got to the driver's side, probably somewhere in the area of the rear door, he started

to back out of the driveway . . ."  Weaber stated that the front tire struck him, and his foot was run over.  This would have placed Investigator Weaber then at the front of the Scheuerman vehicle, with the vehicle backing away from him.  Fearing that he was "about to be dragged under the car," he pulled his gun and shot Mr. Scheuerman three times through the opened driver's window.

The physical evidence, as recorded by the Huntsville Police Crime Scene Technician does not match Investigator Weaber's account.  One of the gunshot wounds suffered by Mr. Scheuerman entered his left rear arm/shoulder area and shows a classic close range shot with accompanying gunshot tattooing and smudging.  The angle of this shot was at nearly 90 degrees to the side of the vehicle and from left (driver's side) to right (passenger side), with a downward angle of about 30 degrees as recorded by the police technician.

Further, the Firearms/Tool Marks Analysis Report performed by the Alabama Department of Forensic Sciences identifies the gunshot distance "ranged from 3 to 6 inches."  This evidence places Investigator Weaber standing adjacent to the center post of Mr. Scheuerman's vehicle, firing "point blank" into Mr. Scheuerman's shoulder.  From this evidence, Investigator Weaber could not have been at the front of the vehicle, and had to be nearly four (4) feet away from the left front tire.  It is therefore not reasonable to believe that Investigator Weaber "was about to be dragged under the vehicle" when he shot Mr. Scheuerman.

The other two gunshot wounds show those entries at the "Mid Sternal" and between the "6th - 7th Intercostal Space" respectively.  The left to right, front to back, and downward angles of those gunshot wounds could not have been accomplished had Investigator Weaber been standing anywhere other than adjacent to the driver's open window.  The most probable scenario, based on the totality of physical evidence, is that Mr. Scheuerman began to back up as Investigator Weaber arrived at the side of the vehicle.   From that position, Investigator Weaber fired one shot at a 90-degree angle at close range.  As Mr. Scheuerman continued to accelerate backwards onto Chatterson Road, Investigator Weaber followed alongside and fired two more shots

into the vehicle striking Mr. Scheuerman in the center and lower chest. Mr. Scheuerman then accelerated forward, away from Investigator Weaber's position, and drove to 904 Chatterson Road where he pulled in the driveway and sought help from the resident.[99]

After examining the position of the spent shell casings, Gaut concludes: "Had the shooting occurred as described by Investigator Weaber, at least two of those spent shell casings should have been found in the yard and not in the roadway."[100] Instead, the photographs of the spent shell casings "indicate a 'walking' pattern of shots fired."[101]

This material fact dispute regarding the very facts that form the basis of Weaber's qualified immunity defense precludes summary judgment. If a jury rejects Weaber's version of the events and, instead, accepts plaintiff's version that Weaber was the aggressor who unreasonably used deadly force on plaintiff, Weaber would not be entitled to qualified immunity. *See Godley v. Newark Police Department*, No. 05-806 (SRC), 2007 WL 269815 (D. N.J. 2007) (finding a material fact dispute as to whether an off-duty police officer, alleged to have used excessive force, was the aggressor regarding a personal issue when he shot an unarmed man).

---

[99]Doc. no. 46, Exh. 3 at 6-7.

[100]*Id.* at 7.

[101]*Id.*

### (4)   *Was it clearly established that Weaber's conduct was unlawful?*

The Supreme Court has instructed:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. ***This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful****, see Mitchell [v. Forsyth*, 472 U.S. 511, 535, n. 12 (1985)]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."   *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis supplied).   The law can be clearly established for purposes of qualified immunity "only by decision of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."   *Hall v. Talladega City Board of Education*, 115 F.3d 821, 826 n.4 (11th Cir. 1997).

It is clearly established that deadly force may not be used on an unarmed burglary suspect merely to prevent escape.   *See Tennessee v. Garner*, 471 U.S. 1 (1985).   Plaintiff has presented sufficient physical evidence to call into question Weaber's assertion that he feared for his own safety, and that this justified his use of deadly force.   Thus, plaintiff maintains that the only purpose in shooting him was to prevent his escape.   Supreme Court precedent is clear that this will not suffice to justify the use of deadly force.   Even the Huntsville Police Department's written

directives made clear that "Deadly force against a fleeing suspect who is both *nondangerous* and *unarmed* is strictly forbidden."[102]   No objective evidence in this record indicates that plaintiff posed a danger to others.  If plaintiff's version of the facts are accepted by a jury, Weaber's use of deadly force clearly would violate the Constitution.

Plaintiff's expert, Gaut, further concludes that Weaber violated multiple Huntsville Police Department written directives regarding the use of deadly force, as well as other procedures regarding traffic stops.[103]   Weaber's employment record shows a history of disregard for these directives and procedures.  "A course of conduct that tends to prove that the requirement was merely a sham, or that respondents could ignore it with impunity, provides equally strong support for the conclusion that they were fully aware of the wrongful character of their conduct." *Hope v. Pelzer*, 536 U.S. at 744.  The facts of the instant case are quite disturbing in that they bring to the fore allegations of abuse of the authority entrusted to police officers.   The inappropriateness of granting qualified immunity under these circumstances is clear, and the court will end its analysis by quoting Judge Tjoflat's opinion in *O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004): "had [defendant]

---

[102]Directive 101-13(12-B-4), cited in doc. no. 55 at 12.

[103]*See* doc. no. 46, Exh. 3 at 8.

displayed the courtesy, professionalism, and respect citizens have the right to expect, [he] would not have acted with the unbridled arrogance of those who believe they will never be held accountable for their behavior."  Weaber's motion for summary judgment on the basis of qualified immunity is due to be denied.[104]

## B.    State Law Claims

Defendant Weaber moves for summary judgment on all state law claims on the ground he is entitled to discretionary-function immunity under Alabama law.  The statutory law of the State of Alabama provides that municipal police officers are entitled to such immunity under the following circumstances:

> Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, . . . and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, *and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties*.

Ala. Code § 6-5-338(a) (1975) (emphasis supplied).  The Alabama Supreme Court

---

[104]As noted previously, summary judgment on a false arrest claim against defendant Weaber, to the extent it existed, is due to be granted.  *See supra* 18-19.

restated the rule governing State-agent immunity in a plurality decision in *Ex Parte*

*Cranman*, 792 So. 2d 392 (Ala. 2000), and as modified in *Hollis v. City of Brighton*,

950 So. 2d 300, 309 (Ala. 2006), as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> (1) formulating plans, policies, or designs;  or
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
> (a)    making administrative adjudications;
> (b)    allocating resources;
> (c)    negotiating contracts;
> (d)    hiring, firing, transferring, assigning, or supervising personnel; or
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner;  or
>
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, *or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975.*
>
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding   anything   to   the   contrary   in   the   foregoing

38

statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792 So. 2d at 405, *Hollis II*, 950 So. 2d at 309 (*emphasis in original to emphasize additional language to the Cranman restatement*).  Both state and federal courts within Alabama have recognized that a statute or a police department's rules may eliminate an officer's discretion, making discretionary function immunity unavailable. *See, e.g., Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1317 (S.D. Ala. 2001) (denying immunity because police department rules prohibited using firearm as a club); *Blackwood v. City of Hanceville*, 936 So. 2d 495, 506-08 (Ala. 2006) (leaving for a jury to decide key facts as to the entitlement of discretionary function immunity given statutes governing maximum speed by emergency vehicles).

Plaintiff argues that Weaber violated multiple Huntsville Police Department written directives, including:

W.D. 101-13(12-B-4)     Deadly force against a fleeing suspect who is both nondangerous and unarmed is strictly forbidden.

39

| W.D. 101-13 (12-H) | Officers will not discharge a firearm at an occupant of or from a moving vehicle except when extreme circumstances require the immediate use of deadly force. |
|---|---|
| W.D. 602-10 (5-B) | You must notify the dispatcher when making a vehicle traffic stop and relay the following information (to the police dispatcher): |

                                       1.      Location of the traffic stop,
                                         2.      The vehicle's tag number and state,
                                         3.      The vehicle make and color, and
                                         4.      Any other pertinent information.[105]

According to plaintiff, Weaber's decision to ignore well established policies and procedures prevents his unauthorized behavior from being cloaked under a mask of discretionary function immunity. If a jury believed plaintiff's version of the events, then Weaber would have violated the directives stated above, and discretionary function immunity would not apply. Thus, Weaber's motion for summary judgment on the basis of discretionary function immunity is due to be denied.

## PART THREE

*Discussion of Plaintiff's Claims Against the City of Huntsville*

## A.    Federal Claims

Plaintiff claims that the City of Huntsville is liable under § 1983 because it has adopted an informal policy condoning the custom and practice of its investigators making traffic stops in plain clothes and in unmarked vehicles. Secondly, plaintiff

---

[105]Doc. no. 44 at 34-35 (citing Plaintiff's Exh. 3).

asserts that the City of Huntsville has failed to adequately train its investigators to know that making traffic stops in such a manner violates proper procedure.[106]

The Supreme Court held in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), that a municipality may not be held liable under 42 U.S.C. § 1983 on a theory of *respondeat superior*: in other words, "a municipality cannot be held liable solely because it employs a tortfeasor." *Id*. at 691. Instead, a municipality may be held accountable in damages for the conduct of a police officer only when the plaintiff shows that execution of the local governmental entity's official "policy" or "custom" effectively was the cause of the injury complained of. *Id*. at 694. Stated somewhat differently, "[a] local government may be held liable under § 1983 only for acts for which it is actually responsible, 'acts which the [local government] has officially sanctioned or ordered.'" *Turquitt v. Jefferson County*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)).[107]

Essentially, this issue of whether a municipal government can be held liable for its custom or policy is a question of causation. *See City of Canton v. Harris*, 489 U.S.

---

[106]*See* doc. no. 44 at 27.

[107] *See generally* Kenneth L. Lewis, *Section 1983: A Matter of Policy — Current Overview of Municipal Liability,* 70 Mich. B.J. 556 (1991) ("Thus, municipal liability attaches only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.").

41

378, 385 (1989) (holding that "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue").  Plaintiff first argues that the City of Huntsville's informal policy condoning the custom and practice of its investigators initiating traffic stops in unmarked vehicles directly contributed to the alleged Fourth Amendment violations.  Secondly, plaintiff argues that the City of Huntsville's failure to adequately train and/or supervise its officers led to plaintiff's constitutional injuries.

With respect to plaintiff's excessive force claim, the City of Huntsville is correct when observing that plaintiff has failed to present any evidence of a policy or custom adopted by the City of Huntsville that caused or condoned Weaber's use of force.  The evidence fails to establish a causal link between any policy or failure to train or enforce its policies by the City of Huntsville and the deadly force used by Weaber.  Accordingly, plaintiff's § 1983 claims against the City of Huntsville pertaining to the use of force will be dismissed.

With respect to plaintiff's claim for unlawful detention or false arrest, plaintiff points to examples in the past where Weaber and other officers engaged in traffic stops in an unmarked unit or while in plain clothes, and were never reprimanded, even though such actions violated policies and procedures of the police department. It does not follow, however, that violating a directive regarding traffic stops in an

42

unmarked vehicle, or while not in uniform, leads to a constitutional injury. Even if it is determined that Weaber's conduct also amounted to an unlawful detention of plaintiff prior to the use of force, no causal connection has been established between failing to enforce policies concerning stops in unmarked vehicles and the constitutional injury alleged in this case. Indeed, there are many examples where an officer would rightfully use his or her discretion while technically off-duty, in plain clothes, and in an unmarked vehicle, to keep the public safe by engaging in a traffic stop. A traffic stop is not unconstitutional merely because it is made by an off-duty officer in an unmarked car. Plaintiff has failed to provide sufficient summary judgment evidence to show the causal connection between his alleged unlawful detention and the City's alleged failure to enforce, or to train officers on, its policies concerning traffic stops in unmarked vehicles. As such, the City of Huntsville cannot be held liable on plaintiff's claims under § 1983.

**B.     State Law Claims**

The City of Huntsville argues that even if plaintiff could prove that Weaber was not entitled to discretionary function immunity because he acted "willfully, maliciously, fraudulently, or in bad faith,"[108] he could not defeat the City's entitlement to discretionary function immunity through § 11-47-190 of the Alabama

---

[108]Doc. no. 37 at 29.

Code, which limits municipal tort liability to claims based on "neglect, carelessness

or unskillfulness" of its agents and employees.  The language "willfully, maliciously,

fraudulently, or in bad faith" comes from the *Cranman* restatement of State-agent

immunity:

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity
>
> > (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise;  or
> >
> > (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792 So. 2d at 405.  The City's argument appears to be based on the premise

that plaintiff's claims involving intentional torts cannot be based on "neglect,

carelessness or unskillfulness."[109]  A line of cases from the Alabama Supreme Court

lends support to the argument that a municipality is immune from intentional, wanton,

or even reckless tort liability.  *See, e.g., Altmayer v. City of Daphne*, 613 So. 2d 366,

369 (Ala. 1993); *Hilliard v. City of Huntsville*, 585 So. 2d 889, 892 (Ala. 1991).

More recently, however, the Alabama Supreme Court has rejected this very argument

in *Borders v. City of Huntsville*, 875 So. 2d 1168, 1183 (Ala. 2003), holding that a

---

[109]*See* doc. no. 37 at 29.

City is not immune from a plaintiff's claims of "excessive use of force, false arrest, false imprisonment, and assault and battery, all of which are based upon [an officer's] alleged neglect, carelessness, and unskillfulness." *Id.; see also Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995) (rejecting municipal immunity for claims of false arrest and imprisonment brought under § 11-47-190 of the Alabama Code).

In this case, plaintiff's complaint alleges as "Count Six - Negligence" that the "injuries suffered by Plaintiff Scheuerman made the subject of this complaint occurred due to the negligence, carelessness and/or unskillfulness of officer Weaber and the City of Huntsville while the officer was acting within the line and scope of his employment with the City of Huntsville, Alabama."[110]   In addition, plaintiff submits ample evidence of Weaber's carelessness and/or unskillfulness to defeat the City's motion for summary judgment on the basis of discretionary-function immunity and § 11-47-190 of the Alabama Code.

Plaintiff argues that the City is also liable for the state law claims asserted because Weaber's actions were a consequence of the City's inadequate training or supervision.[111] This argument is unavailing because plaintiff never attempted to allege a state law claim for negligent supervision or training and, as addressed earlier,

---

[110]Doc. no. 1 at 9.

[111]*See* doc. no. 44 at 35-36.

45

plaintiff failed to submit any evidence to show a causal connection between his alleged assault, battery, and unlawful detention and the City's alleged failure to adequately train or supervise Weaber.

In light of the foregoing, the City's motion for summary judgment on the state law claims based upon discretionary function immunity and § 11-47-190 of the Alabama Code is due to be denied.

## PART FOUR

### *Conclusions and Orders*

For the foregoing reasons, defendant Weaber's motion for summary judgment is GRANTED IN PART AND DENIED IN PART; defendant City of Huntsville's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendant Weaber is not immune as a matter of law from the state and federal claims asserted against him, except that the false arrest claim against defendant Weaber is dismissed with prejudice.  Defendant City of Huntsville is not immune from the state law claims asserted against it, but all federal claims against the City of Huntsville are dismissed with prejudice.

DONE this 23rd day of July, 2007.

_____
United States District Judge